# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 1, 2025               Decided July 21, 2026

No. 25-1047

THRIVENT FINANCIAL FOR LUTHERANS AND THRIVENT
INVESTMENT MANAGEMENT INC.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of a Final Order
of the Securities and Exchange Commission

———

*Andrew B. Kay* argued the cause for petitioners. With him on the briefs was *Philip R. Seybold*.

*Emily T. Parise*, Senior Appellate Counsel, U.S. Securities and Exchange Commission, argued the cause for respondent. With her on the brief were *Tracey A. Hardin*, Solicitor, and *Jeffrey A. Berger*, Assistant General Counsel.

Before: SRINIVASAN, *Chief Judge*, MILLETT and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  Thrivent Financial for Lutherans sells securities.  To conduct that business, Thrivent must adhere to rules promulgated by the Financial Industry Regulatory Authority, commonly known as FINRA.  FINRA has an arbitral code that conflicts with Thrivent's preferred arbitration procedures.  The Securities and Exchange Commission has discretionary authority to amend FINRA's rules through notice-and-comment rulemaking.  So in 2021, Thrivent petitioned the Commission to abrogate portions of FINRA's arbitral code as inconsistent with the Federal Arbitration Act, 9 U.S.C. §§ 1–16.

Three years later, the Commission denied Thrivent's petition in a three-paragraph letter.  That letter noted the Commission's discretion and resource constraints in generic language that would apply to any petition for rulemaking.  The Commission's letter did not engage with Thrivent's arguments.  Thrivent petitioned for our review.

We grant Thrivent's petition in part and remand to the Commission for further consideration.  Our review of agency denials of petitions for rulemaking is quite deferential, but the agency still must "provide analysis that follows a discernable path to which the court may defer." *Environmental Health Trust v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021) (quotation marks omitted).  The Commission's largely boilerplate letter does not clear even that low bar.  The Commission ultimately may be able to deny Thrivent's petition based on its discretion to allocate limited resources to other regulatory priorities, or for other reasons not yet stated.  But the Commission must do more to explain why that discretion warrants denial of Thrivent's petition for rulemaking specifically before we can defer to its judgment.

3

**I**

**A**

The Securities and Exchange Commission regulates the securities industry. But that was not always so. In fact, "the securities industry in the United States has engaged in extensive self-regulation for more than two centuries." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1319 (D.C. Cir. 2024). Until the Great Depression, the industry was essentially autonomous, with private organizations establishing rules and membership criteria by agreement. *See id.* at 1320.

Congress built on that foundation when it organized the Commission in the 1930s. *See* Exchange Act, ch. 404, 48 Stat. 881 (1934) (codified as amended at 15 U.S.C. § 78a *et seq.*); Maloney Act, ch. 677, 52 Stat. 1070 (1938) (codified as amended in multiple sections of 15 U.S.C.). Recognizing that the Commission would be "underequipped" to supervise the full scope of the securities industry, *Alpine*, 121 F.4th at 1320, Congress created a system of "cooperative regulation," under which regulatory duties would "be largely performed by representative organizations of investment bankers, dealers, and brokers," S. REP. NO. 1455, 75th Cong., 2d Sess. 4 (1938). Since the 1930s, "Congress has repeatedly amended the Exchange Act to bolster the self-regulatory scheme by increasing government oversight while preserving self-regulatory organizations' primary role in regulating the securities industry." *Alpine*, 121 F.4th at 1321.

Under the Exchange Act, broker-dealers must register with the Commission to participate in the securities industry. 15 U.S.C. § 78o(a)(1); *see also id.* § 78c(a)(4)–(5) (defining broker and dealer). To do so, they must first join a securities association that is registered with the Commission. *Id.*

§§ 78o(b)(8), 78o-3(a), 78s(a).  Since 2007, FINRA has been "the only registered securities association in the United States." *Alpine*, 121 F.4th at 1321.

As a registered securities association, FINRA must adopt rules for its members and enforce compliance with those rules and federal securities law.  15 U.S.C. § 78o-3(b).  If FINRA wants to change its rules, or adopt new ones, it first must submit its proposed rules to the Commission, which can—after notice and comment—approve or reject the proposal.  *Id.* § 78s(b).

The Commission need not wait for FINRA to propose a change.  It "by rule, may abrogate, add to, and delete from * * * the rules of a self-regulatory organization[.]"  15 U.S.C. § 78s(c).  That blue-pencil power is discretionary:  The Commission can amend FINRA's rules as it "deems necessary or appropriate" to ensure FINRA's "fair administration[,]" to "conform" FINRA's rules with federal securities laws and regulations, "or otherwise in furtherance of the purposes of" the Exchange Act.  *Id.*  When the Commission wields that power, it must hew to the Administrative Procedure Act's notice-and-comment procedures.  *Id.* § 78s(c)(4)(A) (incorporating 5 U.S.C. § 553).

Consistent with its statutory obligations, FINRA has codified an expansive set of rules for its members.  *See* FINRA, *FINRA Rules*, https://perma.cc/CMV4-3LEE.  Among other things, FINRA's rules establish an arbitral forum and provide a comprehensive arbitral code for disputes between its member broker-dealers and their customers.  *See* FINRA Rule 12000 *et seq.*  Three of those rules are relevant here.

First, FINRA Rule 12200 provides that business disputes between FINRA members and their customers must be arbitrated under FINRA's arbitral code if required by a written arbitration agreement or if "[r]equested by the customer[.]"

FINRA Rule 12200. While broker-dealers and their customers "may elect, by mutual consent, to resolve their disputes in a forum other than at FINRA," Rule 12200 precludes FINRA members from requiring non-consenting customers to arbitrate in any other forum. *See* FINRA, Reg. Notice 16-25, at 5 (July 22, 2016), https://perma.cc/93FT-VTD6.

Second, FINRA Rule 12204 governs class-action claims. No such claims may be arbitrated under FINRA's code. FINRA Rule 12204(a). The rule further provides that FINRA members "may not enforce any arbitration agreement against a member of a certified or putative class action" until class certification is denied, the class is decertified, or the individual customer is excluded from the class. *Id.* 12204(d).

Third, FINRA Rule 2268 governs the form and content of members' arbitration agreements. Such agreements must contain highlighted statements calling customers' attention to the fact of an arbitration clause. *See* FINRA Rule 2268(a), (b)(1). Arbitration clauses also may not "include any condition" that "limits or otherwise contradicts the rules of any self-regulatory organization"—that is, FINRA's arbitral code. *Id.* 2268(d)(1). FINRA interprets Rules 2268 and 12204 together to "prohibit member firms from incorporating class action waivers into their customer agreements." FINRA, Reg. Notice 21-16, at 4 (April 21, 2021), https://perma.cc/PQH6-MN2F.

In 2010, Congress invested the Commission with express authority, "by rule, [to] prohibit, or impose conditions or limitations on the use of," arbitration agreements if it finds that doing so would be "in the public interest and for the protection of investors." Dodd-Frank Act, Pub. L. No. 111-203, § 921, 124 Stat. 1376, 1841 (2010), *codified at* 15 U.S.C. § 78o(o). That provision was enacted after the Commission approved

FINRA Rules 2268, 12200, and 12204, and the Commission has not yet exercised its Section 78o(o) authority with respect to FINRA's arbitral code.

**B**

Petitioners are Thrivent Financial for Lutherans and its wholly owned subsidiary Thrivent Investment Management, Inc. Thrivent Financial is a fraternal benefit society that sells insurance to its members through Thrivent Investment Management. Because the distinction between the two entities is irrelevant for present purposes, we refer to both collectively as "Thrivent."

Along with more traditional insurance products, Thrivent sells variable annuities and variable life insurance contracts.[1] Those variable products have long been considered securities within the Commission's jurisdiction under the Securities Act of 1933, ch. 38, 48 Stat. 74. *See SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 204–207 (1967). So when Thrivent began selling those products, it joined FINRA and registered with the Commission as a broker-dealer.

Thrivent's bylaws govern its relationship with its customers. Those bylaws establish a Member Dispute Resolution Program for disagreements between customers and Thrivent. That program culminates in binding, individual arbitration in a non-FINRA forum. Thrivent's program does not comply with FINRA Rules 2268, 12200, and 12204.

---

[1] Generally speaking, traditional products provide a defined benefit in exchange for premiums, while variable products provide a benefit that rises or falls with the performance of an investment portfolio capitalized by premiums. *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104–105 (2d Cir. 2001).

To comply with its obligations as a FINRA member, Thrivent has long treated its program as optional for customers with variable products regulated by the Securities Act. But sometime around 2020, Thrivent decided it no longer wanted to forgo its own dispute-resolution process for its variable products. Thrivent met with FINRA staff and requested an interpretation of FINRA's rules that would allow it to impose its arbitration scheme on customers who have purchased variable products. FINRA responded that "it would be a violation of FINRA rules" if Thrivent treated all disputes with its customers "as being governed solely" by its arbitral program and not also FINRA's rules. J.A. 63.

**C**

In December 2021, Thrivent petitioned the Commission to commence a rulemaking to abrogate or amend FINRA's arbitral Rules 2268, 12200, and 12204. Thrivent contended that those three rules constrained its ability to enter into its preferred arbitration arrangement with its customers. Thrivent argued that, in doing so, FINRA's rules contravene the Federal Arbitration Act's policy of protecting the formation of arbitration agreements. Thrivent posited that the Commission's authority to approve FINRA's rules does not license the Commission to supersede the Arbitration Act. On that basis, Thrivent requested that the Commission either "simply remove" FINRA Rules 2268, 12200, and 12204, or amend them "to clarify that private agreements between FINRA members and their customers that require individual arbitration in a non-FINRA forum are valid and enforceable[.]" J.A. 38.

The Commission docketed Thrivent's petition on January 13, 2022. *See* SEC, *Comments on Petition for Rulemaking to Abrogate or Amend Fin. Indus. Regul. Auth. Rules 2268(d),*

*12200, and 12204(d)*, https://perma.cc/KA72-3AN2. Thrivent met with the Commission to discuss its petition in April 2022, October 2022, and August 2023. Eleven months after filing its petition, having received no response from the Commission, Thrivent petitioned this court for a writ of mandamus compelling the Commission to respond. This court denied mandamus. *See In re Thrivent Fin. for Lutherans*, No. 22-1296 (D.C. Cir. Jan. 23, 2023). In October 2024, Thrivent again sought mandamus. While that petition was pending, the Commission denied Thrivent's petition for rulemaking in March 2025. J.A. 91–92 (SEC decision ); *see In re Thrivent Fin. for Lutherans*, No. 24-1351 (D.C. Cir. March 12, 2025) (denying mandamus petition as moot in light of SEC decision).

In a three-paragraph letter, the Commission noted that self-regulatory organizations like FINRA "have maintained arbitration forums, in various forms, for more than a century, predating the federal securities laws." J.A. 91. It also recited that the Commission has discretion to marshal its limited resources as it sees fit and that its authority to amend FINRA's rules is discretionary. The Commission then related that "reexamination of FINRA's arbitration forum ha[d] not been placed on [its] unified agenda[.]" J.A. 91. Because "[r]esources and personnel [we]re being used for other matters[,]" the Commission "decline[d] to exercise its discretion under [15 U.S.C. § 78s(c)] to revisit the three arbitration-related provisions addressed in the petition." J.A. 91–92.

Thrivent timely petitioned this court for review.

## II

We have jurisdiction over any "final order of the Commission" upon receipt of a petition for review "within

sixty days after the entry of the order[.]" 15 U.S.C. § 78y(a)(1). Orders denying petitions for rulemaking constitute final agency action. *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1037 (D.C. Cir. 2002).

When an agency denies a rulemaking petition, it must give notice "accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e). We review such denials under the Administrative Procedure Act to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* § 706(2)(A).

**III**

The Commission's short-winded letter was arbitrary and capricious because it proffered only cookie-cutter reasons for not acting that could apply to any petition for rulemaking. The letter nowhere connected its reasoning to the content of Thrivent's petition or otherwise evidenced that it afforded the petition individualized consideration. Given that holding, we need not and do not reach the merits of Thrivent's challenge to FINRA's rules. Instead, consistent with our usual practice, we remand to the Commission for reconsideration and reasoned explanation.

**A**

Our review of an agency's decision not to engage in rulemaking is highly deferential. *See Flyers Rights Educ. Fund v. Federal Aviation Admin.*, 864 F.3d 738, 743 (D.C. Cir. 2017) ("*Flyers Rights I*"). But that decision still "must be reasoned if it is to survive arbitrary and capricious review." *Environmental Health Trust*, 9 F.4th at 903 (quotation marks omitted). Mere "conclusory statements" will not suffice. *Id.* "Rather, the agency must provide assurance that it considered the relevant

factors, and it must provide analysis that follows a discernable path to which the court may defer." *Id.* (quotation marks omitted). At bottom, the agency must "adequately explain[] the facts and policy concerns it relied on[.]" *Flyers Rights I*, 864 F.3d at 743 (quotation marks omitted).

The Commission's cursory denial of Thrivent's petition does not satisfy even that deferential standard.

**1**

Thrivent's petition for rulemaking pressed a syllogism: The Commission must ensure FINRA's rules comply with federal law, including the Arbitration Act; FINRA's rules constrain Thrivent's rights under the Arbitration Act; so the Commission must change FINRA's rules.

The issue before this court is not whether the Commission might have substantive responses to those propositions. The Commission admits that its letter denying the petition for rulemaking did "not address[]" whether "FINRA's rules are inconsistent with federal arbitration law" and that it "has not spoken to the underlying issues one way or the other." SEC Br. 3, 36.

Nor is the question whether the Commission could have appropriate non-substantive reasons for declining to take Thrivent's requested action. Agencies have broad discretion in ordering priorities on their regulatory agenda and husbanding scarce agency resources. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."); *New York v. EPA*, 921 F.3d 257, 262 (D.C. Cir. 2019) (describing an agency's "discretion to determine the timing and priorities of its regulatory agenda") (quotation marks omitted); *Flyers Rights I*, 864 F.3d at 749

("[T]he Administration decided that it *should not* address those issues at this time, making the very type of regulatory-effort and resource-allocation judgments that fall squarely within the agency's province."); *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981) (describing "the broad discretionary powers possessed by administrative agencies to promulgate (or not promulgate) rules").

The question instead is whether the Commission, in denying Thrivent's request for a rulemaking at this time, provided a reasoned path for that judgment "to which the court may defer." *Environmental Health Trust*, 9 F.4th at 903 (quotation marks omitted). Here, the Commission simply stated that its "[r]esources and personnel are being used for other matters" listed in its "unified agenda"—an agenda on which "reexamination of FINRA's arbitration forum ha[d] not been placed[.]" J.A. 91.

That is a truism, not a reason. The Commission's letter provides no explanation as to *why* reviewing FINRA's three rules was not a priority or placed on its unified agenda; it just declared that the Commission was not looking at them because it was looking at other unspecified things. *Cf. Coinbase, Inc. v. SEC*, 126 F.4th 175, 181 (3d Cir. 2025) (rejecting the Commission's explanation "that it had higher-priority agenda items—namely, everything else it was doing"). We cannot defer to an explanation that consists of nothing more than boilerplate *ipse dixit* that could be cut and pasted into all manner of rulemaking petition decisions indiscriminately.

Of course, agencies can legitimately decline to engage in rulemaking in an exercise of judgment about how best to deploy their limited resources: The "decision *not* to regulate a given activity is inevitably based, in large measure, on factors not inherently susceptible to judicial resolution—*e.g.*, internal

management considerations as to budget and personnel; evaluations of its own competence; weighing of competing policies within a broad statutory framework." *Natural Res. Def. Council v. SEC*, 606 F.2d 1031, 1046 (D.C. Cir. 1979).

But a threadbare invocation of that discretion "is not a talisman" that obviates all further inquiry. *Coinbase*, 126 F.4th at 201. When an agency decides not to engage in rulemaking because it has concluded that its resources are better directed elsewhere, it must—at a minimum—offer some explanation of *why* it has reached that conclusion in terms of such considerations as identified priorities, urgency, or relative resource intensiveness.

At bottom, the Commission's obligation was to provide a reasoned explanation for the denial of *this* petition for rulemaking. That is, the Commission should have framed its decision with reference to the content of Thrivent's claim and discussed priorities or resource limitations with an eye to the concerns the petition raised. *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (An agency must "adequately explain[] the facts and policy concerns it relied on" to deny a rulemaking petition.) (quotation marks omitted); *cf. Flyers Rights I*, 864 F.3d at 744 ("[W]hen the Administration responds to a petition for rulemaking that exposes a plausible life-and-death safety concern, the Administration must reasonably address that risk in its response.").

The Commission tries to wrap its decision in our deferential precedent. But no prior case stretches the bounds of our deference to agency discretion far enough to rescue this order.

For example, the Commission leans on *WildEarth Guardians v. Environmental Protection Agency*, 751 F.3d 649 (D.C. Cir. 2014), to argue that its cursory reference to

regulatory priorities suffices. That case is inapt. There, we affirmed the Environmental Protection Agency's denial of a petition to list coal mines as a stationary source of air pollution. *Id.* at 656. True, that denial was based on EPA's claimed "resource limitations[.]" *Id.* at 652. But unlike the Commission, EPA actually explained what those limitations were. It provided detailed information about staff and budget constraints, and it described a queue of court-ordered rulemakings that required resolution first. *Id.* at 652–653. The agency elaborated that, in light of those case-specific resource constraints, it was "taking a common-sense, step-by-step approach" that focused first on rulemakings for sources responsible for a greater share of emissions than coal mines. *Id.* at 653. On that record, we "decline[d] to second-guess EPA's decision to prioritize regulatory actions in a way that best achieves" its statutory objectives. *Id.* at 656.

The Commission's denial letter is devoid of such substance.

Our decision in *Flyers Rights Education Fund, Inc. v. Department of Transportation*, 957 F.3d 1359 (D.C. Cir. 2020), is no help to the Commission either. We noted there that the Department of Transportation had "broad discretion" to allocate its resources. *Id.* at 1363 (quotation marks omitted). But we affirmed its denial of a petition for rulemaking because it explained that it "was already engaged in a separate rulemaking process addressing many" of the petitioner's concerns. *Id.*

Not so here.

Finally, *Tourus Records, Inc. v. Drug Enforcement Administration*, 259 F.3d 731 (D.C. Cir. 2001), hurts rather than helps the Commission. There, we held that the letter under review did "not meet the APA standard" because, like the

Commission's letter here, it was "not a statement of reasoning, but of conclusion." *Id.* at 737. We affirmed the agency only because it submitted an additional "contemporaneous explanation of the agency's decision" that "specif[ied] the grounds upon which" it had denied the petition at issue. *Id.* at 738 (quotation marks omitted). Reviewing that explanation, we found "substantial evidence to support the factual findings" in the agency's decision. *Id.* at 739.

Nothing in this record undergirds the Commission's perfunctory rationales.

In sum, we are unaware of any case—and the Commission can point to none—in which this court affirmed an agency order denying a rulemaking petition that was as thinly reasoned as the Commission's was here.

**2**

Nothing more is required to determine that the Commission's letter order was arbitrary and capricious. Nevertheless, Thrivent contends that we *must* go further because, in its view, the Commission "ha[d] no discretion" to deny the petition for rulemaking at all. Opening Br. 39. That is so, says Thrivent, because "a series of cases" from this court holds "that agencies cannot decline to revisit their rules when alerted to their invalidity." Opening Br. 36–37.

Thrivent misreads our precedent. This court has never established an *ex ante* rule that agencies must grant all petitions for rulemaking that challenge the legal validity of an existing regulation. Nor does Thrivent's must-grant rule make sense in the context of petitions for rulemaking.

To start, none of the three cases on which Thrivent relies supports its must-grant rule.

15

In *Geller v. Federal Communications Commission*, 610 F.2d 973 (D.C. Cir. 1979) (*per curiam*), we reviewed the FCC's denial of a rulemaking petition on an extraordinary factual record, *see id.* at 976. Years earlier, the FCC had proposed new regulations for the cable industry as being in the public interest, but it then deferred enacting them solely to await impending legislative reforms to copyright law. *Id.* at 974–975. After Congress acted, Mr. Geller petitioned the FCC to reinstitute the proposal it had previously determined was necessary to serve the public interest. *Id.* at 976. But the FCC denied Mr. Geller's petition without addressing its previous conclusion. *Id.*

In a brief *per curiam* opinion, we held that those "abnormal circumstances" required the FCC to address whether its extant regulations were still in the public interest. *Geller*, 610 F.2d at 979. We stressed that the FCC had given multiple "previous assurances" that it would revisit the issue "once the sought-after revision of the copyright laws was accomplished," and that the sole proffered impediment to agency action "ha[d] long since evaporated." *Id.* at 979–980. Because the FCC had itself determined that the deferred regulations were necessary to protect the public interest, we held that it was "statutorily bound" to resolve whether that was still the case. *Id.* at 980.

That fact-bound outcome in a case of "abnormal circumstances" does not amount to a general rule that agencies must grant all rulemaking petitions that challenge the legal validity of existing regulations. Indeed, we have long "limited" *Geller* to circumstances in which "a significant factual predicate of a prior decision on the subject * * * has been removed." *WWHT*, 656 F.2d at 819.

More to the point, *Geller* did *not* require the FCC to grant the rulemaking petition, as Thrivent insists is required here. In fact, *Geller* expressly disclaimed any implication that the FCC "must necessarily" conduct "a new rulemaking proceeding," leaving "to the [FCC] in the first instance the procedures through which" it would address the relevant legal question. 610 F.2d at 980 n.59.

Our opinion in *American Horse Protection Association, Inc. v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987), only confirms *Geller*'s irrelevance to this dispute. There, as here, we concluded that an agency's denial of a rulemaking petition was arbitrary and capricious because it was inadequately explained. *Id.* at 5–7. Then, relying on *Geller*'s decision not to order the FCC to grant the petition, we remanded to the agency so that it had "a reasonable opportunity to explain [its] decision or to institute a new rulemaking" as requested. *Id.* at 7–8. Again, no hint of Thrivent's must-grant rule.

Finally, *Farmworker Justice Fund v. Brock*, 811 F.2d 613 (D.C. Cir. 1987), is even further afield. There, the Secretary of Labor granted a petition for rulemaking and issued a notice of proposed rulemaking "describing the need for" the requested rule. *Id.* at 614–615. Nine years later, having failed to promulgate a rule, the Secretary reversed course and announced that no rule would be enacted. *Id.* at 618. The petitioner in that case did not file a petition for rulemaking like Thrivent. It instead sued to compel agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1). *See Farmworker Justice Fund*, 811 F.2d at 623 n.10. This court granted the petition and compelled the Secretary to act in the narrow circumstance where an agency—having itself already determined "that further regulation is *required*"—had "nonetheless refuse[d] to promulgate" the very rule it found "to be necessary to fulfill the purposes" of its organic statute. *Id.*

at 623 (emphasis added); *see id*. at 633. That bears no resemblance to this case.

Besides being unsupported by precedent, Thrivent's must-grant rule has little to recommend it. As the Commission notes, a must-grant rule would permit "any party to jump to the front of the line" in an agency's rulemaking queue "through the mere assertion of a legal infirmity[.]" SEC Br. 24. That result would usurp agencies' well-established discretion to set their own agendas. *See Massachusetts*, 549 U.S. at 527; *Flyers Rights I*, 864 F.3d at 743; *WWHT*, 656 F.2d at 817. And it would risk bogging agencies down in protracted notice-and-comment procedures at the whim of every petitioner who takes issue with an agency's legal position. That would leave agencies precious little time to go about the business of advancing a President's regulatory agenda and serving the public interest as a whole.

Thrivent responds that its must-grant rule would apply "[o]nly if the challenged rules are *in fact* unlawful[.]" Reply Br. 23. But every petitioner thinks the rule she challenges as unlawful is *in fact* unlawful. And such assertions cannot be a ticket to hijacking agencies' priorities as they juggle all manner of legal obligations and demands on their time and resources.

**B**

Remand to the agency for reconsideration is "the presumptive remedy" where, as here, an agency's denial of a rulemaking petition is unreasoned. *Flyers Rights I*, 864 F.3d at 747. Thrivent pitches two alternative dispositions, but neither is tenable.

18

**1**

Thrivent's topline remedial request—that we "vacate the challenged FINRA rules now"—has no basis in law. Opening Br. 46 (capitalization altered).

We have jurisdiction only to review and, if warranted, to set aside under the APA a Commission order approving a change to FINRA's rules. *See* 15 U.S.C. §§ 78s(b), 78y(a)(1); 5 U.S.C. § 706(2). But that jurisdiction is cabined by a 60-day statute of repose. 15 U.S.C. § 78y(a)(1). The deadlines to challenge the Commission orders approving FINRA Rules 2268, 12200, and 12204 passed long ago. *See* SEC Release No. 34-26805, 54 Fed. Reg. 21,144 (May 16, 1989) (approving Rule 2268); SEC Release No. 34-55158, 72 Fed. Reg. 4,574 (Jan. 31, 2007) (approving Rules 12200 and 12204).

Thrivent suggests the Fifth Amendment's Due Process Clause requires that it be allowed to challenge the Commission's approval of FINRA's rules now. But statutes of repose comport with the Due Process Clause because regulated parties can bring their challenges as defenses in enforcement proceedings. *See McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 145 S. Ct. 2006, 2017 & n.5 (2025); *see also Corner Post, Inc. v. Board of Governors of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2452–2455 (2024) (distinguishing statutes of repose from statutes of limitations).

**2**

Thrivent next requests that we vacate the Commission's denial of its rulemaking petition and remand with instructions to grant the petition and begin rulemaking to revise FINRA's arbitral code. That proposed remedy at least has the benefit of not transgressing jurisdictional lines. But that is all.

*First*, vacatur and remand with instructions to engage in rulemaking would require us to resolve the merits of Thrivent's petition even though we have already granted Thrivent relief by declaring the letter arbitrary and capricious and remanding for the Commission to reconsider. *Contrast PDK Laboratories Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[I]f it is not necessary to decide more, it is necessary not to decide more[.]"). Given developments at the Commission during the pendency of this litigation, we have no reason to doubt that the Commission will reconsider Thrivent's petition in good faith. *See* SEC Release Nos. 33-11389, 34-103988, 90 Fed. Reg. 45,125, 45,126–45,127 (Sept. 19, 2025) (announcing that "the presence of an issuer-investor mandatory arbitration provision will not impact" the Commission's treatment of registration statements under the Securities Act because "the Federal securities statutes do not override the Arbitration Act's policy favoring enforcement of arbitration agreements"); *see also id.* at 45,129 & n.43 (noting the Commission's distinct "authority to limit, condition, or prohibit arbitration agreements between broker-dealers and their customers").

Getting ahead of the Commission would frustrate judicial review of the merits of Thrivent's arguments in any event. We can sustain agency action only on the grounds the agency proffered below. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Here, the Commission gave far too little explanation to allow for any reasoned judgment about the merits of its position. Because we do not lightly decide issues with one hand tied behind our back, "the usual remedy" when "an agency provides a statement of reasons insufficient to permit a court to discern its rationale" is to "remand to the agency for additional investigation or explanation." *Olivares v. TSA*, 819

F.3d 454, 463 (D.C. Cir. 2016) (quoting *Tourus Records*, 259 F.3d at 737).[2]

*Second*, even if Thrivent were to prevail on the merits, its assertion that "well-established principles *compel* vacating the denial of a rulemaking petition if the agency has violated the law" is inaccurate. Reply Br. 26 (citing *Timpinaro v. SEC*, 2 F.3d 453, 461 (D.C. Cir. 1993)). We have reserved vacatur of orders denying rulemaking petitions only for extraordinary circumstances not present here, and cases from this court ordering rulemaking are rarer still. *See Timpinaro*, 2 F.3d at 461 ("[T]he SEC's denial of the petition * * * is a far cry from that rare and compelling case that would justify our overturning the Commission's refusal to initiate rulemaking.") (quotation marks omitted).[3] Thrivent makes no effort to fit this case within our governing caselaw.

---

[2] Notwithstanding Thrivent's protests, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), does not change this analysis. In exercising our independent judgment, we continue to "seek aid from the interpretations of those responsible for implementing particular statutes." *Id.* at 2262. And agencies like the Commission retain their "power to persuade, if lacking power to control." *Id.* at 2267 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[3] *See also, e.g.*, *Geller*, 610 F.2d at 980–981 & n.59 (vacating denial but leaving to the agency whether to proceed with the rulemaking); *NAACP v. Federal Power Comm'n*, 520 F.2d 432, 447 & n.53 (D.C. Cir. 1975) (vacating denial where agency erroneously concluded it lacked jurisdiction, but expressly reserving the agency's "considerable discretion * * * not to promulgate rules even when it has authority to do so"); *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 594–595 (D.C. Cir. 1971) (ordering rulemaking where the statute specifically required the agency to "initiate the administrative process whenever there is a substantial question about the safety of the registered pesticide").

*Third*, requiring the Commission to grant Thrivent's petition would be particularly unwarranted here because the Commission has discretion to address Thrivent's concerns in multiple other ways.

Rather than undertaking a rulemaking to amend FINRA's rules, the Commission could craft a tailored waiver of FINRA's arbitral rules for variable insurance products, for Thrivent, or for any other relevant subdivision of FINRA's members. *See* 15 U.S.C. § 78s(g)(2) ("The Commission, by rule, * * * may relieve any self-regulatory organization of any responsibility * * * to enforce compliance with any specified provision of * * * rules or regulations * * * by any member of such organization * * * or any class of such members[.]").

Alternatively, the Commission could, if warranted, use its rulemaking authority to preserve FINRA's rules to protect the integrity of the securities markets. Congress has authorized the Commission, "by rule, [to] prohibit, or impose conditions or limitations on the use of," agreements to arbitrate disputes "arising under the federal securities laws, the rules and regulations thereunder, or the rules of a self-regulatory organization[.]" 15 U.S.C. § 78o(o) ("Authority to restrict mandatory pre-dispute arbitration"); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (A "clearly expressed congressional intention" to displace the Arbitration Act will "suspend its normal operations in a later statute.") (quotation marks omitted). The Commission, in other words, could cure the conflict Thrivent perceives between the Arbitration Act and FINRA's rules by determining through notice-and-comment rulemaking that FINRA's three rules are "in the public interest and for the protection of investors." 15 U.S.C. § 78o(o). The Commission's authority in that regard redoubles the propriety of remand in this case.

**IV**

For the foregoing reasons, we grant Thrivent's petition for review in part and remand to the Commission for reconsideration of Thrivent's petition for rulemaking. We otherwise deny the petition for review.

*So ordered.*